2021 IL App (1st) 200806-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
August 3, 2021

No. 1-20-0806

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| MARGARET ZAGEL, not individually but as Trustee of the Francis E. Maxwell Living Trust, Dated November 26, 1991, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 18-CH-6943 |
| HASTINGS CUTOFF GROUP, LTD., an Illinois corporation, and ANDREW J. MAXWELL, individually and as president of Hastings Cutoff Group, Ltd., | ) ) ) ) ) | The Honorable Anna M. Loftus, Judge Presiding. |
| Defendants-Appellees. | ) | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held:*   Trial court's dismissal with prejudice of claims asserted by successor trustee for accounting and breach of fiduciary duty following death of settlor is affirmed. Successor trustee lacked standing to assert claims where trust agreement did not show a manifestation of intent by settlor to hold his ownership interest in corporation as a trust asset prior to his death. Trial court's denial of motion to modify protective order is also affirmed.

¶ 2   Following the death of Francis E. Maxwell (Francis) in 2017, the plaintiff, Margaret Zagel,

in her capacity as successor trustee of the Francis E. Maxwell Living Trust dated November 26,

1991 (the Trust), brought this action against the defendants, Hastings Cutoff Group, Ltd. (Hastings), and Andrew J. Maxwell (Andrew). Hastings is an Illinois corporation of which Francis had owned a 25% share during his lifetime. The plaintiff and Andrew are two of Francis' four children, and Andrew is the president of Hastings. In her first amended complaint, the plaintiff seeks an order directing the defendants to open Hastings' corporate books and records and provide a corporate accounting to the Trust. The plaintiff also asserts several claims alleging that Andrew breached certain fiduciary duties allegedly owed to the Trust between 2012 and 2017. During discovery, the trial court ordered the parties to brief the issue of whether Francis' 25% ownership share of Hastings was an asset held in the Trust as of 2012 and after, such that the Trust had an interest in Hastings that gave the plaintiff standing to assert the present claims on the Trust's behalf. Following this briefing, the trial court made a summary determination that the plaintiff lacked standing to assert these claims on behalf of the Trust because Francis' 25% ownership share in Hastings had not been made an asset of the Trust prior to his death. As a result of this summary determination, the trial court entered an order dismissing all counts of the first amended complaint with prejudice. The plaintiff appeals this order, along with the trial court's denial of a motion to modify a protective order. For the reasons that follow, we affirm the judgment of the trial court.

¶ 3                                I. BACKGROUND

¶ 4        Francis was an attorney who practiced in Nashville, Illinois, including in the area of estate planning. He served as judge of the Twentieth Judicial Circuit of Illinois from 1966 to 1986. He was married to Joan Maxwell (Joan), and they had four children. In retirement, Francis and Joan relocated to Florida.

¶ 5        In 1978, Francis and Joan entered into an agreement with their son Andrew to invest in an apartment building located at 2226 N. Fremont Street in Chicago (Fremont property). At that time,

the Fremont property was owned by the three of them individually, and their verbal agreement was that Andrew owned 50% of it while Francis and Joan owned 25% each.

¶ 6        In 1991, Francis established the Trust, which was a self-settled, revocable trust of which Francis was trustee during his lifetime. The trust agreement provided that all property transferred to the trustee, together with any property received by the trustee under the terms of Francis' last will and testament or otherwise shall be held and disposed of by the trustee upon the terms and conditions set forth therein. The trust agreement itself did not identify any specific property as being placed into or held in the Trust as of that time. Relevant to this appeal is article III of the trust agreement, which stated in pertinent part as follows:

"Upon and after the death of the Grantor, the Trustee shall receive, hold, administer, and distribute the trust estate as follows:

A. Probate Assets. The Trustee shall receive distribution of assets under the terms of the Grantor's Last Will and Testament and shall add the same to the trust estate.

* * *

C. Dispositive Plan. The Trustee shall ascertain the Grantor's trust and probate estate before the payment of any estate, inheritance, succession or similar death taxes, state or federal. In the event the Grantor is survived by his wife, JOAN B. MAXWELL, the Trustee shall divide all of the rest, residue and remainder of the Grantor's trust estate, including assets, if any, which have been distributed to the trust estate from the Grantor's probate estate, into two shares identified as the Marital Deduction Trust Share and the Residuary Trust Share, and shall administer each of such shares as a separate trust as follows:

1. Marital Deduction Trust Share. * * *

* * *

2. <u>Residuary Trust Share</u>. The balance of the trust estate, after payment of debts, taxes and other obligations and the creation of the Marital Deduction Trust Share should the Grantor's wife survive the Grantor, or the entire balance of the trust estate should the Grantor's wife predecease the Grantor, shall be set aside as a separate trust to be known as the Residuary Trust Share and shall be held and administered by the Trustee on the following terms and conditions:

a. <u>Distribution of Income and Principal</u>. During the lifetime of the Grantor's spouse, the Trustee shall pay to or for the use and benefit of the Grantor's spouse all the net income from the Residuary Trust Share ***. In addition, the Trustee is authorized to pay to or for the use and benefit of the Grantor's spouse such amounts from the principal of the Residuary Trust Share as in the Trustee's sole discretion shall be necessary for the health, maintenance and support of the Grantor's spouse ***; provided, however, the Trustee shall make no principal invasions of the Residuary Trust Share until the principal of the Marital Deduction Trust Share shall be completely exhausted."

Article III.C.2 went on in subparagraphs (b) and (c) to address the distribution of assets remaining in the Residuary Trust Share upon Joan's death, whether that occurred before or after the death of Francis.

¶ 7       In 2003, Hastings was incorporated, and title to the Fremont property was placed in a land trust of which Hastings was the beneficial owner. The parties' respective ownership interests continued according to a verbal agreement, with Andrew owning a 50% share of Hastings and Francis and Joan each owning a 25% share. Andrew served as the president of Hastings, and

Francis was also an officer. It is undisputed that as of the time of Hastings' incorporation, Francis' ownership share of Hastings was not an asset held in the Trust.

¶ 8 Over time, the value of the Fremont property increased substantially. The record indicates that, as Francis and Joan began to contemplate their estate planning, they wanted Andrew to buy out their interests in the Fremont property or to sell the Fremont property, so that their ownership interests could be equitably distributed among their children after they died. On September 30, 2008, Francis executed a first amendment to the trust agreement, which added several provisions to article III.C.2 giving the successor trustee directions about how to account for Francis' ownership interest in the Fremont property when determining and distributing the Residuary Trust Share. That same day, Francis also executed his last will and testament, which was a pour-over will providing that the residue of his estate was given to the trustee of the Trust to be administered as part of the principal of the Trust. It is undisputed that the Francis' ownership share in Hastings was not made an asset of the Trust as of 2008.

¶ 9 In 2012, the Fremont property was sold, and Andrew, on behalf of Hastings, reinvested the profits of that sale by purchasing other real estate. On December 7, 2012, Francis executed a second amendment to the trust agreement. That second amendment revoked and deleted the first amendment to the trust agreement in its entirety and reinstated the original terms of the trust agreement. The second amendment to the trust agreement provided in pertinent part as follows:

"Subparagraph a. of paragraph C.2 of ARTICLE III, of the original Trust, is hereby deleted and replaced in its entirety with the following:

'a. Distribution of Income and Principal. Grantor directs that the following calculations, considerations and distributions of principal be made as soon as practicable after the establishment of the Residuary Trust Share:

i) This sub-Trust has a twenty-five (25%) percent ownership in an Illinois corporation, known as, Hastings Cutoff Group, Ltd. (the "Company") that currently owns interests in various commercial properties in the Chicago area. Grantor's son, ANDREW J. MAXWELL, currently owns a fifty (50%) percent interest in the Company and Grantor's spouse's Trust owns the remaining twenty-five (25%) interest.

ii) The shareholders of the Company have determined and stipulated to a fair value for this Trust's ownership share of the Company, and while the Trustees of Grantor's and Spouse's respective Trusts are entitled, by their agreements with Andrew, to receive income on the Trusts' investments, the value of the principal invested is stipulated to remain static, neither appreciating nor depreciating with the market, sales or otherwise.

iii) In computing the respective shares of the Grantor's four (4) children, the successor Trustee is instructed to treat the static principal value of this Trust's ownership interest in the Company as $337,000.00, less any actual distributions of principal (and not income) from the Company to the Trustee hereof, subsequent to this Amendment.

iv) The successor Trustee is directed, following the death of the Grantor and as soon as practicable after the administration of this Trust, to convey outright and free of trust or encumbrance, this Trust's shares of the Company to Grantor's son, ANDREW J. MAXWELL, per stirpes.

v) The successor Trustee is directed, following the death of the Grantor, and as soon as practicable after the administration of this Trust, to

- 6 -

distribute from the principal of this Residuary Trust Share, an amount, cash or in kind, equal to the value of the Trust's interest in the Company (as calculated above) to each of the then living of Grantor's three (3) other children, to-wit: REBECCA MAXWELL, MARGARET ZAGEL, and KATHRYN MAXWELL.

vi) The rest and residue of this Residuary Trust Share, after distribution of the foregoing shares of the Company to Andrew and an equal value of principal to each of Grantor's three (3) daughters (per stirpes), is to be held for the Grantor's spouse's benefit, if she survives Grantor. *** ' "

The remainder of subparagraph (vi) then continued with language tracking that set forth above as article III.C.2.a of the original trust agreement. See *supra* ¶ 6.

¶ 10 Francis passed away in Florida on March 21, 2017. Following his death, the plaintiff became successor trustee of the Trust. On June 17, 2017, the plaintiff served on Andrew and the other beneficiaries an inventory of the Trust's assets as of the date of Francis' death. That inventory listed the Trust's assets as five bank or investment accounts titled in the Trust's name, as well as a "1/4 Interest Hastings Cutoff" valued at $286,747. In several email communications by Andrew to the plaintiff around this time, Andrew made statements suggesting that he also believed that Francis' shares of Hastings had been placed into the Trust as of the time of Francis' death. In March 2018, Andrew sent to the plaintiff a schedule K-1 for tax year 2017 listing the Trust as a 25% shareholder of Hastings.

¶ 11 Upon becoming successor trustee, the plaintiff made multiple requests to Andrew for information concerning Hastings, its assets and finances, the value of the Trust's interest in it, income or distributions that it owed to the Trust, and the like. Believing that Andrew was not

providing adequate information in this regard, the plaintiff filed the present action against Andrew and Hastings on May 31, 2018, seeking an order that Hastings open its corporate books and financial statements and provide a corporate accounting to the plaintiff on behalf of the Trust. The original complaint also included one count alleging that Andrew breached fiduciary duties to the Trust by classifying it as a resident of Illinois instead of Florida in the schedule K-1 for tax year 2017, the effect of which was that Hastings avoided making a pass-through entity withholding payment to the Illinois Department of Revenue. On September 27, 2018, the plaintiff filed the operative first amended complaint, which added four additional counts against Andrew. Three of those counts alleged that he breached his fiduciary duty to the Trust by (1) making inadequate distributions from Hastings to Francis between 2012 and 2017 and to the Trust in 2017, (2) using Hastings' funds for his own benefit and for the benefit of entities he controlled over the interests of the other shareholders, (3) depositing funds that belonged to Hastings into accounts titled in his name or in the name of other entities he controlled, and (4) causing Hastings to enter into loans or contracts that did not reflect the terms of arms-length transactions between 2012 and 2017. The final count was a shareholder oppression claim concerning the same allegations of misconduct that formed the bases of the breach of fiduciary duty counts.

¶ 12        Initially, the trial court denied a motion by the defendants to dismiss the plaintiff's claims, which contended that the Trust lacked standing to assert them. Discovery progressed, and on September 19, 2019, the trial court entered a protective order setting forth how the parties could use the material obtained through discovery in this case and requiring the destruction of certain material at the conclusion of this case. Also on September 19, 2019, the trial court ordered the parties to file briefs addressing the issue of the Trust's ownership of Hastings stock at all times relevant to claims being asserted.

¶ 13      On October 10, 2019, the plaintiff filed a motion arguing, in general, that Francis expressed his intent to fund the Trust with his ownership share of Hastings when, on December 7, 2012, he amended article III.C.2.a of the trust agreement to state, "This sub-Trust has a twenty-five (25%) percent ownership in an Illinois corporation, known as, Hastings Cutoff Group, Ltd." The plaintiff's motion thus sought a declaration that the Trust owned Francis' ownership share of Hastings at least as of December 7, 2012. The defendants filed a response and a cross-motion for summary determination under section 2-1005(d) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005(d) (West 2018)) that Francis' shares of Hastings had never been transferred into the Trust during his lifetime and that, because the shares had not yet been transferred to the Trust through a probate proceeding, the Trust lacked an ownership interest in Hastings that could confer standing on the plaintiff to assert the present claims on its behalf. Generally speaking, they argued that the statement relied upon by the plaintiff did not show a present intent by Francis to transfer the shares to the Trust, because it was added to a subparagraph directing the successor trustee how to receive, hold, administer, and distribute the estate "[u]pon and after the death of the Grantor" and "after the establishment of the Residuary Trust Share." They also argued that the statement was that "[t]his sub-Trust" had the shares, which was a reference to the Residuary Trust Share that only came into existence as a separate trust after Francis' death. Thus, they argued that the shares were property of Francis' probate estate and had to pass through probate before becoming trust assets.

¶ 14      Following extensive briefing and oral argument, the trial court issued a written order granting the defendants' motion for summary determination and denying the plaintiff's motion, which the court treated as a motion for summary judgment. The trial court reasoned that the language of the trust agreement and the second amendment accounts for the Hastings stock as part of the Residuary Trust Share, as the reference to a "sub-Trust" is an unambiguous reference to the Residuary Trust

Share. The trial court found no language in the trust agreement or the second amendment evidencing that the shares had been transferred to the Trust in 2012. It determined that, although there was ambiguous language in other parts of the documents, that ambiguous language did not concern how or whether the shares became part of the Trust in 2012. The court found that, as all of the counts of the first amended complaint were premised upon the Trust having a present ownership in the shares of Hastings, its summary determination that the Trust did not own those shares meant that the Trust lacked standing to prosecute the claims that had been asserted. The trial court therefore dismissed all counts of the plaintiff's first amended complaint with prejudice. However, it reiterated that its ruling only rejected claims premised upon the Trust's present ownership of Hastings' shares since 2012, and that if the Trust later came into possession of an ownership share of Hastings, such as through administration of the probate estate, then the Trust could pursue whatever claims were appropriate at that point.

¶ 15     While the motions discussed above were pending, the plaintiff also filed a motion to modify the protective order. The trial court denied this motion in the same written order in which it granted the motion for summary determination and dismissed the complaint. The details of this motion and the trial court's reasons for denying it are discussed in the analysis below. This appeal followed.

¶ 16                                   II. ANALYSIS

¶ 17               A. Trust's ownership of the Hastings interest during Francis' lifetime

¶ 18     This case comes before us following the trial court's dismissal of this case with prejudice, based upon its summary determination that the Trust did not come into possession of Francis' ownership share of Hastings in 2012 and that therefore the Trust lacked standing to pursue the claims being asserted. As the trial court's order disposed of the entire case based on the conclusion that that there was no genuine issue of material fact and the defendants were entitled to judgment

as a matter of law, we consider it a summary judgment for purposes of our jurisdiction.[1] Summary judgment is appropriately granted if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018).

¶ 19    The doctrine of standing is a component of justiciability, requiring that a party have a real interest in the action brought and in its outcome. *Tufo v. Tufo*, 2021 IL App (1st) 192521, ¶ 55. The essence of the inquiry regarding standing is whether the litigant, either in an individual or a representative capacity, is entitled to have the court decide the merits of a dispute or a particular issue. *Id.* The issue of standing is a matter of law, subject to *de novo* review. *Id.* ¶ 50.

¶ 20    On appeal, the plaintiff argues that the trial court erred by concluding that the trust agreement did not demonstrate that Francis' intent was that his ownership share of Hastings was an asset of the Trust as of at least 2012. The plaintiff argues that, when the entirety of the trust agreement and its amendments are read together and considered in light of Francis' overall dispositional plan, the only unambiguous interpretation of the trust agreement is that Francis funded the Trust with his

---

[1] A summary determination of a major issue under section 2-1005(d) of the Code (735 ILCS 5/2-1005(d) (West 2018)) is by its nature an interlocutory order that contemplates further proceedings in a case and is therefore not considered a final and appealable order. *Morningside North Apartments I, LLC v. 1000 N. LaSalle, LLC*, 2017 IL App (1st) 162274, ¶ 8. However, the order entered in this case can be considered a summary judgment in favor of the defendants under section 2-1005(b) of the Code (735 ILCS 5/2-1005(b) (West 2018)), because granting the relief that the defendants sought warranted judgment in their favor as a matter of law. The trial court expressly noted in its written order that, regardless of the defendants' designation of their motion as one seeking a summary determination of a major issue under section 2-1005(d) instead of a motion for summary judgment under section 2-1005(b), the location of the Hastings shares prior to Francis' death was a threshold issue in the case, and trust interpretation involved a question of law that was properly addressed in a dispositive motion. The trial court further stated that it was applying the same summary judgment standard regardless of the designation of the motion. Given the trial court's statements, as well as our precedent for looking beyond labels to the relief granted and considering a summary determination of a major issue that resulted in a disposition of the entire case to be a summary judgment (see *Morningside North Apartments I*, 2017 IL App (1st) 162274, ¶ 8), we conclude that this case involves a final order over which we have jurisdiction under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017).

ownership interest in Hastings no later than December 7, 2012, the date when he executed the second amendment to the trust agreement. According to the plaintiff, any other reading inserts ambiguity into the trust agreement and renders other provisions of it meaningless.

¶ 21    The parties agree that this is an issue controlled by the trust documents. They also agree that the interpretation of the trust documents is governed by Florida law, as expressly required by the terms of Francis' trust agreement. Florida law provides that " '[o]ne of the basic tenets for the construction of trusts is to ascertain the intent of the settlor and to give effect to his intent.' " *Barrett v. Kapoor*, 278 So. 3d 876, 879 (Fla. Dist. Ct. App. 2019) (quoting *Bacardi v. White*, 463 So. 2d 218, 221 (Fla. 1985) (citing *West Coast Hospital Ass'n v. Florida National Bank*, 100 So. 2d 807, 810 (Fla. 1958))). A court is to ascertain a settlor's intent from the four corners of the trust instrument, through a consideration of all of its provisions taken together. *Minassian v. Rachins*, 152 So. 3d 719, 725 (Fla. Dist. Ct. App. 2014). A court ascertains intent by looking to " 'the plain and ordinary meaning of the terms set forth in the [t]rust instrument.' " *Horgan v. Cosden*, 249 So. 3d 683, 686 (Fla. Dist. Ct. App. 2018) (quoting *Nelson v. Nelson*, 206 So. 3d 818, 819 (Fla. Dist. Ct. App. 2016)). The court should not resort to isolated words or phrases, but instead it should interpret the instrument as a whole, taking into account the settlor's general dispositional scheme. *Provost v. Justin*, 19 So. 3d 333, 334 (Fla. Dist. Ct. App. 2009). If the language used in the trust instrument is unambiguous, the settlor's intent as expressed therein controls, and the court cannot rely on extrinsic evidence. *Vigliani v. Bank of America, N.A.*, 189 So. 3d 214, 219 (Fla. Dist. Ct. App. 2016). However, the fact that both sides ascribe different meanings to the language used does not mean that it is ambiguous, so as to allow the admission of extrinsic evidence. *Minassian*, 152 So. 3d at 725. The proper interpretation of a trust instrument is a question of law. *Schlossberg v. Estate of Kaporovsky*, 303 So. 3d 982, 985 (Fla. Dist. Ct. App. 2020).

¶ 22        As stated, the issue before this court is whether the trust documents demonstrate an intent by Francis to hold his ownership interest in Hastings as an asset of the Trust as of 2012, as opposed to holding it in his individual capacity such that it had to be administered as part of his probate estate before it could become an asset of the Trust. Florida follows the usual rule that an owner of property can, by a declaration of trust, make himself trustee of that property for another. *Brevard County v. Ramsey*, 658 So. 2d 1190, 1194 (Fla. Dist. Ct. App. 1995) (citing William F. Fratcher, *Scott on Trusts* § 17.1, at 226-228 (4th ed. 1988)); see also Restatement (Second) of Trusts § 17(a) (1959). No formal transfer of the property is necessary, since the purpose is that the settlor himself shall continue to hold the property, no longer for his own benefit, but for the benefit of another. *Brevard County*, 658 So. 2d at 1194 (citing Fratcher, *Scott on Trusts* § 17.1 at 226-228). Nothing more than the manifestation of the intention to create such a trust is necessary, except in situations (not present here) where the subject matter of the trust is an interest in land or the disposition is in substance a testamentary disposition. *Id.* Where the owner of property wishes to make himself trustee of that property for another, the simplest method of doing so is to execute an instrument declaring that he holds the property in trust. *Id.* No particular words are necessary, as any statement showing that ownership or control of property is vested in one person for the benefit of another is sufficient to impose a trust. *Beaubien v. Cambridge Consolidated, Ltd.*, 652 So. 2d 936, 939 (Fla. Dist. Ct. App. 1995); see also *Provident Group-Continuum Properties, L.L.C. v. Crapo*, 157 So. 3d 409, 411 (Fla. Dist. Ct. App. 2015).

¶ 23        Relying on the principles set forth above, the plaintiff argues that the language used throughout the trust agreement and Francis' general dispositional scheme support a finding that Francis intended to hold his ownership share of Hastings in the Trust at least as of the time he executed the second amendment in 2012. First, the plaintiff points out that Francis used the

present-tense word "has" in the first sentence of subparagraph III.C.2.a.i, which states, "This sub-Trust has a twenty-five (25%) percent ownership in [Hastings]." She asserts that Francis' use of the word "has" shows that he intended the Trust to have current ownership of his Hastings interest as of that time, and no further documentation transferring the Hastings stock to the Trust was required. See *Brevard County*, 658 So. 2d at 1194. She contends that this interpretation (that Francis intended the Trust to have current ownership of his Hastings interest) is supported by the next sentence in the same subparagraph, which states that Andrew "currently owns" a 50% interest in Hastings and that "Grantor's spouse's Trust owns" the remaining 25% interest. She argues that this shows Francis was making a statement about current ownership of the Hastings shares and that it would be "illogical or unusual estate planning" for Francis to state that his wife's trust owned an interest in Hastings if he did not also intend his interest to be held in the Trust.[2]

¶ 24    Continuing her argument, the plaintiff points out that in the subparagraphs that follow, Francis made several additional statements in the present tense referring to the Trust having an interest in Hastings and that these collectively show that Francis intended the Trust to own his Hastings interest during his lifetime. Specifically, in subparagraph (ii), he stated that the shareholders of Hastings had determined and stipulated to a fair value for "this Trust's ownership share" of Hastings. He referred in that same subparagraph to the fact that "the Trustees of Grantor's and Spouse's respective Trusts are entitled, by their agreements with Andrew, to receive income

---

[2] The defendants contend that the plaintiff forfeited the argument that the court should look to Francis' "dispositional scheme" or to his "unified estate plan" with Joan by failing to present these arguments to the trial court. We reject this argument, as our review of the record indicates that this overall argument was properly made to the trial court. However, it does not appear that any of Joan's actual estate-planning documents were before the trial court at the time it granted summary judgment. Instead, they were attached to the plaintiff's later-filed motion to modify the protective order. The trial court stated in its summary judgment ruling that it had not reviewed Joan's estate documents. As our review is limited to documents properly before the trial court at the time it ruled on the motion for summary judgment, we do not consider the contents of Joan's estate-planning documents in our review. *Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 42.

on the Trust's investments." In subparagraph (iii), Francis directed the successor trustee to treat the static principal value of "this Trust's ownership interest" in Hastings as $337,000. And in subparagraph (iv), he directed the successor trustee to convey "this Trust's share" of Hastings to Andrew following his death. The plaintiff also contends that Francis used the future tense in other places where he was giving directions to the successor trustee about what should occur after his death, and that Francis drew a distinction in these subparagraphs by using the word "Grantor" to refer to himself individually and "Trustee" to refer to himself in his capacity as trustee of the Trust.

¶ 25    For their part, the defendants argue that the trust documents, when read as a whole, do not contain a manifestation of intent by Francis to place his ownership share of Hastings into the Trust as of the time he executed the second amendment in 2012. They cite Francis' placement of the provisions at issue into article III of his trust agreement, other provisions of that article involving the establishment of the Residuary Trust Share as a separate trust after his death, and his use of the term "sub-Trust" as having ownership of the interest in Hastings.

¶ 26    More specifically, the defendants point out when Francis amended the trust agreement through the second amendment, he chose to add the provisions at issue to article III, an article that deals exclusively with how the successor trustee is to receive, hold, administer, and distribute the trust estate after Francis' death.[3] Thus, all of the provisions relied upon by the plaintiff are subordinate to Francis' direction in the opening sentence of article III that, "[u]*pon and after the death of the Grantor*, the Trustee shall receive, hold, administer, and distribute the trust estate as follows." (Emphasis added). The provisions are also preceded by paragraph III.A, which expressly

---

[3] Article III of the trust agreement bears the heading "PROVISIONS UPON DEATH OF GRANTOR." However, article VI of the trust agreement provides that headings are included solely for convenience and shall not be used to interpret nor expand, limit, or modify the terms of the trust agreement. As such, we attach no significance to this heading when interpreting the trust agreement.

contemplates that assets will pass through probate under the terms of Francis' last will and testament and be added to the trust estate. Next, paragraph III.C directs that if Joan survives Francis, then the successor trustee is to "divide all of the rest, residue and remainder of the Grantor's trust estate, including assets, if any, which have been distributed to such trust estate from the Grantor's probate estate, into two shares identified as the Marital Deduction Trust and the Residuary Trust Share, and shall administer each of such shares as a separate trust." Paragraph III.C.2 then directs that either the balance of the trust estate after the creation of the Marital Deduction Trust Share, or the entire balance if Joan predeceases Francis, "shall be set aside *as a separate trust to be known as the Residuary Trust Share* to be held and administered by the Trustee" upon the terms and conditions set forth. (Emphasis added). Then, in paragraph III.C.2.a, which was added by the second amendment, Francis directed "that the following calculations, considerations and distributions of principal be made as soon as practicable *after the establishment of the Residuary Trust Share.*" (Emphasis added). That sentence is then immediately followed by subparagraph III.C.2.a.i, which states, "*This sub-Trust* has a twenty-five (25%) percent ownership in [Hastings]." (Emphasis added).

¶ 27    Thus, the defendants argue, when all of the above provisions are considered as a whole, the trust agreement provides that "[u]pon and after the death" of Francis, a "separate trust known as the Residuary Trust Share" is to be established, and "after the establishment of the Residuary Trust Share," "[t]his sub-Trust" (*i.e.*, the Residuary Trust Share) receives the Hastings shares, along with any other probate assets not placed into the Marital Deduction Trust Share. The defendants argue that the trial court correctly interpreted the trust agreement by finding that "[t]he 'sub-Trust' language is an unambiguous reference to the Residuary Trust Share" and that there is no language evidencing an intent to transfer the Hastings shares into the Trust itself in 2012.

¶ 28    In response to the defendants' argument, the plaintiff asserts that that it violates the fundamental principle of trust interpretation that the trust agreement must be read as a whole. The plaintiff points out that, while Francis used the term "sub-Trust" as having ownership of the Hastings interest in subparagraph (i), he used the different term "Trust" as having ownership of it in subparagraphs (ii), (iii), (iv), and (v). Also, in subparagraphs (v) and (vi), he refers specifically to the "Residuary Trust Share." Thus, the plaintiff argues that, if "sub-Trust" is interpreted to mean the Residuary Trust Share only and not the Trust as a whole, such that Francis' use of "sub-Trust" is interpreted as meaning that he was not presently intending the Trust as a whole to have his Hastings shares (because the Residuary Trust Share was not established until after his death), then such an interpretation would strip any meaning from the fact that Francis used these three different terms. The plaintiff argues that it introduces ambiguities into the trust agreement if the terms "sub-Trust," "Trust," and "Residuary Trust Share" are all construed to refer to the Residuary Trust Share. The plaintiff argues that the only way to give meaning to all three of these terms is by concluding that Francis was expressing an intent to own the Hastings interest through the Trust at least as of the date of the second amendment.

¶ 29    After carefully considering the parties' arguments and the trust documents themselves, we hold that the trial court correctly determined that the trust agreement, as amended, does not demonstrate a manifestation of intent by Francis to hold his ownership share of Hastings as an asset of the Trust prior to his death. When all of the provisions of the trust documents are viewed as a whole and considered together, the plain language simply does not show that Francis intended to hold the shares in the Trust during his lifetime. As both parties point out, Francis was an attorney and judge who was experienced in estate planning. Although he could have amended any part of his trust agreement to address the Hastings shares, one of the most significant factors showing his

intent is the fact that he chose to place the provisions at issue into article III.C.2.a., and he added them there without making any other amendments to the paragraphs to which those provisions were subordinate. In other words, he added these provisions to the article that states in its initial sentence that it is setting forth how the successor trustee is to receive, hold, administer, and distribute the trust estate "[u]pon and after the death of Grantor." Then, in paragraph III.C, he set forth the circumstances in which the trustee is to divide the trust estate into two shares "and shall administer each of such shares as a separate trust." Paragraph III.C.2 addresses the second of these two shares and sets forth what is to "be set aside as a separate trust to be known as the Residuary Trust Share." Thus, these provisions make clear that the Residuary Trust Share did not come into existence as a separate trust until after Francis' death, and Francis made no amendment that would change this fact when he executed the second amendment.

¶ 30     Instead, Francis added the statement in paragraph III.C.2.a that certain "considerations and distributions of principal be made as soon as practicable *after the establishment* of the Residuary Trust Share." (Emphasis added). This statement indicates that Francis did not intend or believe that the "separate trust to be known as the Residuary Trust Share" was a trust that had already been established or that existed as of 2012. Then, immediately after this reference to the establishment of the Residuary Trust Share, subparagraph III.C.2.a.i states, "*This sub-Trust* has a twenty-five (25%) percent ownership in [Hastings]." (Emphasis added). Based on where Francis placed this phrase in the trust agreement and the words immediately preceding it, we agree with the trial court that "[t]his sub-Trust" is an unambiguous reference to the Residuary Trust Share trust, a separate trust that is only established after Francis' death. We cannot ignore Francis' choice to use the term "sub-Trust" by interpreting it to mean the Trust as a whole. In context, this is a clear reference to the separate Residuary Trust Share trust.

¶ 31    Because it is clear that Francis was referring in subparagraph III.C.2.a.i to the Residuary Trust Share trust and that he did not intend the Residuary Trust Share trust to be established during his lifetime, we do not interpret his statement that this sub-Trust "has" a 25% ownership in Hastings to be a manifestation of his intent that his ownership interest in Hastings was currently held in trust as of that time. Rather, this sentence is more reasonably interpreted as a direction by Francis that, after the establishment of the two separate trusts, it is the Residuary Trust Share trust, not the Marital Deduction Trust Share trust, that has the ownership share of Hastings. This interpretation makes sense because, by being made part of the Residuary Trust Share trust, the Hastings shares can then be conveyed to Andrew, and the other three children can receive an amount equal to the value of the Hastings interest from the principal of the Residuary Trust Share, as provided in the subparagraphs that follow subparagraph III.C.2.a.i.

¶ 32    As for the remainder of the plaintiff's arguments, we agree that there are isolated phrases within the subparagraphs of article III.C.2.a of the trust agreement that could be read to suggest an unexpressed understanding by Francis that he considered his ownership share of Hastings to be a current asset of the Trust. These would include, for example, references to "this Trust's ownership share" of Hastings and the clause stating that "the Trustees of Grantor's and Spouse's respective Trusts are entitled, by their agreements with Andrew, to receive income on the Trusts' investments." However, these are merely isolated phrases, and a key principle of trust interpretation is that we cannot rely on isolated words or phrases to ascertain a settlor's intent, but instead we must interpret the instrument as a whole. *Provost*, 19 So. 3d at 334. It would violate this principle if we discerned intent by elevating the significance of these isolated phrases—all of which are located within the subpart of the trust agreement addressing the administration of the Residuary Trust Share after it has been established—over the trust agreement as a whole as we

have discussed it above. None of the isolated phrases cited by the plaintiff overcome our conclusion that, when the trust agreement is interpreted as a whole, it contains no manifestation of intent by Francis to hold his ownership share of Hastings as an asset of the Trust prior to his death.

¶ 33     We further point out that we find no ambiguity about the fact that trust agreement does not show a manifestation of intent by Francis to hold the Hastings interest in trust as of the time he executed the second amendment. The plaintiff makes the argument that an interpretation that the term "sub-Trust" means the Residuary Trust Share trust creates ambiguity about how to interpret other terms of the trust agreement. She contends that this interpretation injects uncertainty about how to read subparagraphs (ii) through (v) of article III.C.2.a, and she questions whether some instances in which the term "Trust" is used should likewise be interpreted to refer to the Residuary Trust Share. We reject this argument because, as explained above, the phrase "[t]his sub-Trust" is a clear and unambiguous reference to the Residuary Trust Share. We disagree with the plaintiff that interpreting "sub-Trust" to be a reference to the Residuary Trust Share injects ambiguity into the subparagraphs of the trust agreement that follow the use of that term. It would appear to us that these subparagraphs can all be given meaning and effect after the Residuary Trust Share is established, and the plaintiff has not articulated how any specific term or provision is made susceptible to more than one reasonable interpretation as a result of interpreting "sub-Trust" to mean the Residuary Trust Share.

¶ 34     Because we have found no ambiguity in the trust documents about the absence of any manifestation of intent by Francis to hold his ownership share of Hastings as an asset of the Trust prior to his death, the plain language of the trust agreement controls, and we cannot rely on extrinsic evidence to ascertain Francis' intent. *Vigliani*, 189 So. 3d at 219. We point out, though, that the extrinsic evidence relied upon by the plaintiff goes entirely to *Andrew's* understanding

about whether Francis transferred the Hastings interest into the Trust and the fact that *Andrew* has taken inconsistent positions on the issue over time. See *supra* ¶ 10. The question, however, is not Andrew's understanding or intent on the issue, but whether Francis' manifestation of intent to hold the shares in trust prior to his death has been shown.

¶ 35                                B. Dismissal "with prejudice"

¶ 36        The plaintiff's second principal argument on appeal is that the trial court erred in its judgment order by dismissing her first amended compliant "with prejudice" based upon its determination that the plaintiff lacked standing to bring the claims asserted on behalf of the Trust. The plaintiff argues that the dismissal should have been "without prejudice," because the trial court expressly acknowledged that if the Trust later comes into possession of the Hastings shares, such as through probate administration, then it would be entitled to assert whatever claims it deemed appropriate at that time. We agree with the trial court's acknowledgement. However, we reject the plaintiff's argument that the trial court's dismissal of the first amended complaint "with prejudice" constituted error.

¶ 37        Procedurally, the trial court dismissed the compliant after granting the defendants' motion for a summary determination of a major issue under section 2-1005(d) of the Code. 735 ILCS 5/2-1005(d) (West 2018). As mentioned above, that is a section of the Code that normally contemplates that further proceedings will occur in a case. It directs the trial court, upon finding that no genuine issue of material fact exists as to one or more major issues of a case, to "draw an order specifying the major issue or issues that appear without substantial controversy, and directing such further proceedings upon the remaining undetermined issues as are just." *Id.* Here, however, no further proceedings were warranted once the trial court made the summary determination that the Trust did not come into possession of the Hastings shares as of 2012 and thus the plaintiff lacked

standing to pursue the claims that had been asserted on the Trust's behalf. In other words, the effect of the summary determination was that the defendants were entitled to judgment as a matter of law on all counts of the first amended complaint, based on the plaintiff's lack of standing to assert them. This is the equivalent of a grant of summary judgment. See *Morningside North Apartments I, LLC v. 1000 N. LaSalle, LLC*, 2017 IL App (1st) 162274, ¶ 8 (construing a summary determination that resulted in the disposition of the entire case as a summary judgment).

¶ 38    This court has previously recognized that "[t]he concept of a summary judgment 'without prejudice' is inapposite." *Poulos v. Reda*, 165 Ill. App. 3d 793, 801 (1987). While a dismissal "without prejudice" indicates that a suit has been dismissed without a decision on the merits and that the dismissal is not conclusive of the rights of the parties, summary judgment is the equivalent of a trial and is an adjudication of a claim on its merits. *Id.* In this case, all of the claims that the plaintiff asserted were premised upon the Trust's ownership of the Hastings interest from 2012 until the time of Francis' death in 2017 and continuing thereafter, and the trial court adjudicated the merits of the issue that the Trust did not have ownership of the shares during the relevant time period. As the disposition of this case involved an adjudication on the merits, there was no error in the trial court's order dismissing the first amended complaint "with prejudice."

¶ 39                                C. Modification of protective order

¶ 40    The plaintiff's final principal argument on appeal is that the trial court erred when it denied her motion to modify the protective order entered in this case, to permit the use of material that had been disclosed in discovery in this case in other pending and contemplated litigation involving the present parties and the ownership of Hastings. The plaintiff pointed out that it was undisputed that, even if the Trust lacked standing to assert claims involving the ownership of Hastings, Francis' ownership interest in Hastings would eventually pass to it though administration of his

probate estate, and at that time appropriate claims would be filed on the Trust's behalf. The motion also asserted that present litigation was pending involving Joan's guardianship and that there would also be future litigation involving Joan's trust amendments and estate, in which her own ownership interest in Hastings and her right to receive income would be at issue. Additionally, the motion sought to expand the categories of individuals to whom material designated as confidential could be disclosed and to strike the section of the protective order requiring the parties to destroy material marked confidential at the conclusion of this case. The plaintiff argued that her requested modifications to the protective order would avoid duplicative discovery in these other cases.

¶ 41    In denying the motion, the trial court stated that, while it understood this case was only one part of a broader legal dispute involving these parties, it would be improper to enter an order allowing the discovery from this case to be used in other legal proceedings and jurisdictions, "potentially creating thorny procedural questions for other judges down the line." The trial court thus reiterated its expectation that the parties would comply with the record destruction provisions of the protective order at the conclusion of this case. The court stated that if the parties wished to use the discovery material produced in this case in other cases, they should follow the appropriate discovery procedures of those cases but, as the parties were aware through this litigation of what was contained in the records that had been produced, issuing and responding to discovery requests should be a *pro forma* matter.

¶ 42    Prior to the briefing of this appeal, the plaintiff also filed a motion in this court seeking to have this court make the same modifications to the protective order that the trial court had refused to make. That motion indicated that four separate actions were by then pending in various trial courts in Florida and Illinois, which involved these parties and touched upon issues relating to those presented in this case. We ordered that the plaintiff's motion should be taken with the case.

¶ 43    Illinois Supreme Court Rule 201(c)(1) (eff. July 1, 2014) authorizes a trial court to "make a protective order as justice requires, denying, limiting, conditioning, or regulating discovery to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or oppression." The parameters of protective orders are entrusted to the discretion of the trial court. *Skolnick v. Altheimer & Gray*, 191 Ill. 2d 214, 224 (2000). A reviewing court will alter the terms of a protective order only if no reasonably person could adopt the view taken by the trial court. *Id.*

¶ 44    We conclude that the trial court properly denied the plaintiff's motion to modify the protective order and further deny the plaintiff's similar motion filed in this court. We echo the reasoning expressed by the trial court, particularly the point that it could be procedurally problematic for a court in this case to enter an order that affirmatively permitted the use of discovery materials from this case in other litigation. This is especially true given our determination that the plaintiff lacked standing to file this case, the fact that much of the collateral litigation is pending in a different state with different discovery rules, and that it is unknown to us exactly how the discovery produced in this case relates to the parties and issues involved in the collateral litigation.[4]

¶ 45                    III. CONCLUSION

¶ 46    For the reasons discussed above, the judgment of the trial court is affirmed.

¶ 47    Affirmed.

---

[4] During the briefing of this appeal, four motions were filed that the court ordered be taken with the case. As discussed above, the plaintiff's motion to modify the protective order is denied. The defendants' motion to dismiss the appeal and enter sanctions against the plaintiff is denied. The defendants' motion to strike the statement of facts in plaintiff's brief and for other relief is denied. The defendants' motion to strike the plaintiff's reply brief or alternatively to strike its exhibits is denied.